Commonwealth of Massachusetts
BRISTOL SUPERIOR COURT
Case Summary
Civil Docket

05-10522-WGY

FILED
IN CLERK'S OFFICE

**BRCV2004-01300**
**Campbell v Hallsmith-Sysco Food Services, Inc.**

2005 MAR 31  A 11: 57

U.S. DISTRICT COURT
DISTRICT OF MASS

| | | | | |
|---|---|---|---|---|
| File Date | 11/22/2004 | Status | Disposed: transfered to other court (dtrans) | |
| Status Date | 03/28/2005 | Session | C - CtRm Main - (Taunton) | |
| Origin | 1 | Case Type | B22 - Employment Discrimination | |
| Lead Case | | Track | F | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Service | 02/20/2005 | Answer | 04/21/2005 | Rule12/19/20 | 04/21/2005 |
| Rule 15 | 04/21/2005 | Discovery | 09/18/2005 | Rule 56 | 10/18/2005 |
| Final PTC | 11/17/2005 | Disposition | 01/16/2006 | Jury Trial | Yes |

<table>
<tr><th colspan="2">PARTIES</th></tr>
<tr>
<td>

**Plaintiff**
Michael G. Campbell
Warwick, RI 02886
Active 11/22/2004

</td>
<td>

**Private Counsel 555020**
Joseph B Lichtblau
92 State Streeet
Boston, MA 02109
Phone: 617-722-9955
Fax: 617-772-9966
Active 11/22/2004 Notify

</td>
</tr>
<tr>
<td>

**Defendant**
Hallsmith-Sysco Food Services, Inc.
380 Worcester Street
Norton, MA 02766
Answered: 03/09/2005
Answered 03/09/2005

</td>
<td>

**Private Counsel 507900**
Richard C Van Nostrand
Mirick O'Connell DeMallie & Lougee
100 Front Street
Suite 1700
Worcester, MA 01608-1477
Phone: 508-791-8500
Fax: 508-791-8502
Active 03/09/2005 Notify

**Private Counsel 633915**
Michael D Badger
Mirick O'Connell DeMallie & Lougee
100 Front Street
Suite 1700
Worcester, MA 01608-1477
Phone: 508-791-8500
Fax: 508-791-8502
Active 03/09/2005 Notify

</td>
</tr>
<tr>
<td>

**Other interested party**
FILE COPY
Active 11/22/2004 Notify

</td>
<td></td>
</tr>
</table>

| | | |
|---|---|---|
| **ENTRIES** | | |
| Date | Paper | Text |
| 11/22/2004 | 1.0 | Complaint & civil action cover sheet filed |

Commonwealth of Massachusetts
BRISTOL SUPERIOR COURT
Case Summary
Civil Docket

## BRCV2004-01300
## Campbell v Hallsmith-Sysco Food Services, Inc.

| Date | Paper | Text |
|---|---|---|
| 11/22/2004 | | Origin 1, Type B22, Track F. |
| 03/09/2005 | 2.0 | ANSWER by Hallsmith-Sysco Food Services, Inc. to COMPLAINT (claim of trial by jury reqstd) |
| 03/28/2005 | 3.0 | Notice for Removal to the United States District Court filed by Hallsmith-Sysco Food Services, Inc. |
| 03/28/2005 | | Case REMOVED this date to US District Court of Massachusetts |

EVENTS

| Date | Session | Event | Result |
|---|---|---|---|
| 11/22/2004 | CtRm Main - (Taunton) | Status: by clerk<br>Initial One-trial Review | Event held as scheduled |

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

#1

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss

BRISTOL SUPERIOR COURT
C.A. No. C04-1300

MICHAEL G. CAMPBELL,

     Plaintiff,

v.

HALLSMITH-SYSCO FOOD
SERVICES, INC.

     Defendant.



BRISTOL, SS SUPERIOR COURT
FILED

2 2 2004

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

### COMPLAINT AND JURY DEMAND

1.    The Defendant, Hallsmith-Sysco Food Services, Inc.
("Hallsmith-Sysco") is a Delaware corporation, with a principal
place of business in Massachusetts on 380 Worcester Street,
Norton, Massachusetts (Bristol County).

2.    The plaintiff is a resident of Warwick, Rhode Island.

3.    Plaintiff was hired by Defendant on September 11, 2000,
as a third shift dry warehouse worker at Sysco's warehouse, on
380 Worcester Street, Norton, Massachusetts.  As a third shift
worker, Plaintiff worked overnight, from 7:00 P.M. to 5:00 A.M.

4.    Plaintiff is a gay man.  Co-workers at Hallsmith-Sysco
either knew that Plaintiff was gay or decided Plaintiff was gay
based on his appearance, manner and other factors.

5.    Plaintiff began working for Hallsmith-Sysco on first
shift (a day shift), for training purposes, then was assigned to

the third shift after about two-and-a half months.  Another
worker, Al Jacobs ("Jacobs"), trained with Plaintiff on the day
shift then was also assigned to work on the third shift.  Jacobs'
third shift assignment was in the freezer department and
Plaintiff's was in the dry goods department, placing Jacobs and
Plaintiff in frequent contact at work.

6.    From approximately the second week Plaintiff began
working at Hallsmith-Sysco, while he and Jacobs were still in
training on the first shift, Jacobs made derogatory comments,
which were  directed at Plaintiff or intentionally made in
Plaintiff's presence, about Plaintiff being gay or about gays in
general.  Jacobs made these comments almost constantly, on nearly
a daily basis, through June 13, 2002, the day Plaintiff left
Hallsmith-Sysco.

7.    For example, Jacobs would say "Hey faggot, you're going
to die," or "You fucking fag, I'm going to kill you," and similar
statements to that effect.

8.    On one occasion, Jacobs asked if Plaintiff "liked being
fucked" by his "many boyfriends."  On another occasion, in or
around January 2001, Jacobs asked Plaintiff if Plaintiff had
"made rate" yet, and when Plaintiff replied no, Jacobs said it
was because "a queer" could not do this type of work.

9.    Jacobs frequently made these and similar derogatory
comments when one or more persons, often friends of Jacobs', were

-2-

present.  As a result, Plaintiff was subject to ridicule and humiliation and derision.

10.  On more than one occasion, Jacobs made derogatory comments about Plaintiff being gay or about gays in general in the presence of or within earshot of Ken Marnard, a supervisor.

11.  Jacobs often made these derogatory comments to Plaintiff while standing in intimidating positions, such as standing a few inches from Plaintiff with his index finger near Plaintiff's nose.

12.  There were also several occasions on which Jacobs made similar derogatory comments in Sysco's cafeteria, in a loud voice, so that any person, including management and executive personnel, could hear them.  For example, on one occasion, while Jacobs and Plaintiff were still on the day shift and Plaintiff was eating lunch in the company cafeteria, Jacobs said in a loud voice "Mike, you have AIDS, right, all faggots have AIDS."  On another occasion, Jacobs said (or yelled) in the cafeteria to another worker named Kevin Padgro, "Watch out Kevin, Campbell is going to try to grab your ass and dick."

13.  Around March 2001, other third shift workers began making derogatory comments to Plaintiff or in Plaintiff's presence about being gay or about gays in general, on a regular basis.

14.  Plaintiff's co-workers sometimes made these derogatory

-3-

comments about Plaintiff being gay or about gays in general in front of supervisors, including Ken Marnard and Art Coriea. On information and belief, Jim Stone, another supervisor, heard or was aware that workers made anti-gay comments on the third shift.

15.    For example, co-worker John Augustine told Plaintiff he would beat up Plaintiff if Plaintiff ever looked at him in a sexual way. On another occasion, in March 2002, John Augustine called Plaintiff "faggot" and "queer," then afterwards, while Augustine and Plaintiff were working in the same aisle, Augustine asked if Plaintiff needed a tampon "because Plaintiff was angry." From about January 2001 to June 13, 2002, John Augustine referred to Plaintiff constantly and on numerous occasions as "you fucking queer."

16.    Co-worker Trevor Ashley made many comments about gays in Plaintiff's presence, including "all gays should be dead." On another occasion, Trevor Ashley threatened to punch Plaintiff in the face, followed by "you fucking fag," or words to that effect.

17.    Co-worker Kevin Padgro, a friend of Jacobs, made numerous jokes about gays. On June 13, 2002, as Kevin Padgro, co-worker Kirby St. Amour and Plaintiff were leaving the building, Kevin Padgro asked Plaintiff in the presence of numerous other co-workers gathered near the exit, including three supervisors -- Ken Marnard, Jim Stone and Art Coriea -- if Plaintiff liked "chin music," explaining this referred to "when a

guy's balls slap your chin when you're giving head." Kevin
Padgro then said to Plaintiff, "Hey Mike, do you like how it
feels when you put Portuguese sausage up your ass?" The
supervisors present clearly heard these comments, but did
nothing, and in fact left the building. Other workers began
following up on Kevin Padgro's comments and laughing at
Plaintiff.

18. In or about June 2002, Art Coriea and about 5-7 workers
Art Coriea supervises wore bandanas and yelled throughout the
warehouse "We're the P-Town posse," while other workers imitated
effeminate gay men and made jokes about gays.

19. A co-worker known as "Johnny Bravo" called Plaintiff a
stupid fag on at least one occasion.

20. In July 2001, Ken Marnard (Supervisor) told Plaintiff
that Plaintiff was not allowed to talk because Plaintiff was on
light duty, even though there was no such rule. Subsequently,
while Plaintiff was working at the supervisor's station as a desk
clerk, Ken Marnard stood close to Plaintiff and passed gas. When
Plaintiff tried to leave the desk because of the smell, Ken
Marnard physically blocked Plaintiff's exit, then said to others
who were watching, "Oh Cinderella can't handle the smell." Other
workers laughed, while Jim Stone (a supervisor) sprayed a can of
air freshener.

21. Co-worker Al Hebert on various occasions called

-5-

Plaintiff "stupid fag" or names to that effect. Once, Al Hebert asked if Plaintiff was a "nigger lover" because Plaintiff listens to Jazz music.

22.  In or about February 2001, a co-worker known as "Reggie" from the dry department asked if Plaintiff had to be "so close" to him, while Plaintiff was working with "Reggie."   When Plaintiff apologized for being in the way, "Reggie" replied that he "didn't like fags around."  After this occurred, "Reggie" frequently blocked Plaintiff from getting into aisles or prevented Plaintiff from passing him, which affected Plaintiff's "pick" (number of items  picked off shelves) and consequently Plaintiff's bonus and incentive pay.

23.  Other co-workers referred to Plaintiff in his presence as "fag" or made derogatory comments about gays, such as for example, "faggots should be dead," or followed up on Al Jacobs' derogatory comments about gays or Plaintiff being gay when Jacobs made such comments.

24.  Plaintiff made Hallsmith-Sysco aware of the hostile environment Plaintiff encountered on several occasions, as well as the types of comments directed at Plaintiff or made in Plaintiff's presence.

25.  On or about July 5, 2001, Plaintiff informed Julia Gannon, Vice President of Human Resources, that the abusive comments about Plaintiff's sexual orientation and derogatory

comments about gays in general had been ongoing since September 2000. Julia Gannon promised to speak to Plaintiff's supervisors and promised to put up posters concerning discrimination. Julia Gannon also stated that Plaintiff "could not expect Sysco to change."

26. No such posters concerning discrimination were thereafter posted in the warehouse area, and the derogatory comments directed at Plaintiff concerning has sexual orientation continued after July 5, 2001.

27. On or about May 2, 2002, during Plaintiff's vacation, Plaintiff again spoke to Julia Gannon and told Gannon that Plaintiff could not take any more. Plaintiff informed Gannon that he was passing out, throwing up, had uncontrollable shaking and could not sleep.

28. On this occasion, Plaintiff gave Julia Gannon a list of names of persons who had made the aforementioned derogatory comments or engaged in the aforementioned conduct, including persons identified in this Complaint, and requested that Gannon speak with the individuals involved.

29. Subsequently, Plaintiff's treatment at Hallsmith-Sysco worsened. On or about June 4, 2002, Plaintiff  spoke with Plaintiff's supervisor, Jim Stone, who told Plaintiff that he knew Hallsmith-Sysco was full of bigots but "never thought it bothered anyone." Jim Stone also admitted he had heard jokes

-7-

about gays.    Plaintiff informed Jim Stone that Plaintiff had
spoken with Julia Gannon.

30.   Jim Stone was present on June 13, 2002, when Plaintiff
was derided and humiliated of as Plaintiff was leaving the
building.   On other occasions, supervisors were present or within
clear earshot when comments were made ridiculing gays.

31.   Plaintiff did not return to Hallsmith-Sysco after June
13, 2002, following the incidents related herein which occurred
on that date.

32.   Plaintiff was constructively discharged from
Hallsmith-Sysco as of June 13, 2002.

33.   On June 14, 2002, Plaintiff's primary care physician
removed Plaintiff from Hallsmith-Sysco on the basis of a
temporary disability related to Plaintiff's knees.   Although
problems with Plaintiff's knees in fact created a temporary
disability, Plaintiff was also unable to return to work on
account of the continuous stress and symptoms caused by the
hostile environment at Hallsmith-Sysco.    Thereafter, Plaintiff
was temporarily, totally disabled from returning to work on
account of post-traumatic stress disorder.

34.   Throughout Plaintiff's employment at Hallsmith-Sysco,
Plaintiff experienced increasingly worsening symptoms, which
Plaintiff had not previously experienced, including blacking out,
throwing up, sleeplessness, uncontrollable shaking, racing

-8-

thoughts, severe headaches, severe anxiety and panic, and

depression.  On many occasions at Hallsmith-Sysco, Plaintiff felt

humiliated, ostracized, belittled, embarrassed and intimidated on

account of comments and conduct directed at Plaintiff because

Plaintiff is gay or was because Plaintiff was perceive to be gay.


    35.   Plaintiff continued to experience many of these

symptoms subsequent to his last day of work at Hallsmith-Sysco.

    36.   The continuous derogatory comments and conduct referred

to in this Complaint unreasonably interfered with Plaintiff's

work performance at Hallsmith-Sysco.

    37.   Hallsmith-Sysco knew or should have known of the

aforementioned hostile environment, discrimination on account of

sexual orientation, and sexual harassment, and did not take

adequate measures to prevent these unlawful practices or

ameliorate the effect of these practices on Plaintiff.

COUNTS

COUNT I

  (G.L. c. 151B, Sec.4/Hostile Environment/Sexual Harassment)

    38.   Plaintiff repeats and reallges paragraphs 1 through 37

as if more fully stated herein.

    39.   The defendant was plaintiff's employer.

    40.   Plaintiff's co-workers and supervisors in the employ of

the defendant treated plaintiff differently from similarly

-9-

situated, heterosexual co-workers.

41.  Plaintiff's co-workers and supervisors in the employ of the defendant subjected Plaintiff to a hostile environment by making derogatory comments and engaging in conduct designed to humiliate Plaintiff on in the workplace on account of plaintiff's actual or perceived sexual orientation.  Said comments and conduct were pervasive and continuous and were perceived by Plaintiff as hostile.

42.  Plaintiff's supervisors and co-workers in the employ of the defendant made derogatory comments of a sexual nature to plaintiff, which comments had the purpose or effect of unreasonably interfering with plaintiff's work environment by creating an intimidating, hostile, humiliating or sexually offensive work environment, and additionally constituted sexual harassment under G.L. c. 151B, §1(18) and G.L. c. 151B, §4, ¶16A.

43.  The defendant knew or should have known that Plaintiff was subject to differential treatment, a hostile environment, and sexual harassment, all as aforementioned, and took no action, or ineffective action to prevent the plaintiff's continued exposure to said treatment, hostile environment or sexual harassment, and thereby allowed or permitted the plaintiff to be exposed to said differential treatment, hostile work environment and sexual harassment in the workplace in violation of G.L. c. 151B, §4.

44.  The plaintiff's exposure to differential treatment,

-10-

hostile work environment and sexual harassment continued after the defendant knew or should have known of the differential treatment, hostile work environment and sexual harassment.

45.  Defendant constructively terminated plaintiff on the basis of his sexual orientation, in violation of G.L. c. 151B, §4(1) and (1B).

46.  The defendant committed the practices complained of with knowledge or reason to know that said practices violated G.L. c. 151B, §4.

47.  As a result of the aforementioned conduct of defendant, plaintiff suffered and continues to suffer harm, including lost wages and benefits, medical expenses, humiliation, mental anguish and embarrassment, emotional distress.

48.  As a result of the aforementioned conduct of defendant, plaintiff suffered constructive termination from employment, and subsequent loss of wages.

<u>COUNT II</u>

(Reckless/Intentional Infliction of Emotional Distress)

49.  Plaintiff repeats and reallges paragraphs 1 through 48 as if more fully stated herein.

50.  The defendant intentionally or recklessly terminated plaintiff based upon his actual or perceived sexual orientation.

51.  The defendant recklessly or intentionally inflicted emotional distress or the defendant or knew or should have known

-11-

that emotional distress was likely to result from its conduct.

52.    The defendant's conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community.

53.    The defendant's conduct caused plaintiff severe emotional distress, mental anguish, humiliation and embarrassment of a nature that no reasonable person could be expected to endure.

<u>PRAYERS</u>

WHEREFORE, plaintiff prays this Court:

A.    Enter judgment for the plaintiff against the defendant;

B.    Award the plaintiff compensatory money damages against the defendant in an amount to be determined by this Court, including back pay, front pay, damages in lieu of benefits and other damages;

C.    Award the plaintiff punitive damages against the defendant for discrimination in all forms pursuant to G.L. c. 151B, Sec. 9;

D.    Award the plaintiff attorney's fees, costs and expenses of suit, as against the defendant, pursuant to G.L. c. 151B, Sec. 9;

E.    Enter such other relief as this Court determines is equitable and proper.

<u>JURY DEMAND</u>

PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE

MICHAEL G. CAMPBELL,

By his attorney,

Joseph B. Lichtblau
BBO # 555020
92 State Street
Boston, MA 02109
(617) 722-9955

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

-13-

| CIVIL ACTION COVER SHEET | DOCKET NO(S) COH-1300 | Trial Court of Massachusetts Superior Court Department County: BRISTOL |
|---|---|---|

| PLAINTIFF(S) Michael G. Campbell | DEFENDANT(S) Hallsmith Sysco Food Services, Inc. |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Joseph B. Lichtblau, 92 State Street, Boston, MA 02109 (617) 722-9955 | ATTORNEY (if known) Richard C. Van Nostrand Mirick O'Connell 100 Front Street Worcester, MA 01608-1477 (508) 791-8500 |
| Board of Bar Overseers number: BBO # 555 020 | |

## Origin code and track designation

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

BRISTOL, SS SUPERIOR COURT
FILED
22 2004
MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B22 | Employment Discrim | (F) | (X) Yes ( ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

## TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ............................................. $ To be documen
2. Total Doctor expenses .............................................. $
3. Total chiropractic expenses ........................................ $
4. Total physical therapy expenses ................................... $
5. Total other expenses (describe) ................................... $
   Subtotal $
B. Documented lost wages and compensation to date .................. $ To be document
C. Documented property damages to date ............................. $
D. Reasonably anticipated future medical and hospital expenses ...... $
E. Reasonably anticipated lost wages ................................ $
F. Other documented items of damages (describe)
   $
G. Brief description of plaintiff's injury, including nature and extent of injury (describe) distress
   Lost Wages, Medical Expenses and severe emotional
   as set forth in the Complaint, causing damage in excess
   of $25,000.                                              $
                                                    TOTAL $ .............

## CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $. ............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT    N/A

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _Joseph B. Lich_    DATE: 11/14/04

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

**JOSEPH B. LICHTBLAU**
Attorney at Law
92 State Street
Boston, Massachusetts 02109

Telephone: 617-722-9955
Facsimile: 617-722-9966
E-mail: jbl@world.std.com

BRISTOL, SS SUPERIOR COURT
FILED

2 2 2004

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

November 19, 2004

Civil Clerk
Bristol Superior Court
9 Court Street, Room 13
Taunton, MA 02780

Re:   Michael G. Campbell v. Hallsmith-Sysco Food Services, Inc.
      Civil Action No. C04-1300

Dear Sir or Madam:

Enclosed for filing and docketing are:

1.   Complaint and Jury Demand;

2.   Civil Action Cover Sheet;

3.   Law firm check for $290.00

Please send me three (3) Bristol summonses for which I have enclosed an additional
$15.00.  Thank you for your attention to this matter.

Very truly yours,

Joseph B. Lichtblau

Enclosures

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. BRCV2004-01300-C

MICHAEL G. CAMPBELL,
    Plaintiff

V.

HALLSMITH-SYSCO FOOD SERVICES,
INC.,
    Defendant



BRISTOL, SS SUPERIOR COURT
FILED

MAR     9 2005

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

### ANSWER TO COMPLAINT

Now comes the defendant, Hallsmith-Sysco Food Services, Inc. (hereinafter "Hallsmith-Sysco"), and responds to the allegations in the plaintiff's Complaint as follows:

    1.    Hallsmith-Sysco admits the allegations in this paragraph.

    2.    Upon information and belief, Hallsmith-Sysco admits the allegations in this paragraph.

    3.    Hallsmith-Sysco admits the allegations in this paragraph.

    4.    Hallsmith-Sysco is without information sufficient to admit or deny whether the plaintiff is homosexual and denies the remaining allegations in this paragraph.

    5.    Hallsmith-Sysco admits the allegations in this paragraph.

    6.    Hallsmith-Sysco denies the allegations in this paragraph.

    7.    Hallsmith-Sysco denies the allegations in this paragraph.

    8.    Hallsmith-Sysco denies the allegations in this paragraph.

    9.    Hallsmith-Sysco denies the allegations in this paragraph.

10.    Hallsmith-Sysco denies the allegations in this paragraph.

11.    Hallsmith-Sysco denies the allegations in this paragraph.

12.    Hallsmith-Sysco denies the allegations in this paragraph.

13.    Hallsmith-Sysco denies the allegations in this paragraph.

14.    Hallsmith-Sysco denies the allegations in this paragraph.

15.    Hallsmith-Sysco denies the allegations in this paragraph.

16.    Hallsmith-Sysco denies the allegations in this paragraph.

17.    Hallsmith-Sysco denies the allegations in this paragraph.

18.    Hallsmith-Sysco denies the allegations in this paragraph.

19.    Hallsmith-Sysco denies the allegations in this paragraph.

20.    Hallsmith-Sysco denies the allegations in this paragraph.

21.    Hallsmith-Sysco denies the allegations in this paragraph.

22.    Hallsmith-Sysco denies the allegations in this paragraph.

23.    Hallsmith-Sysco denies the allegations in this paragraph.

24.    Hallsmith-Sysco admits that the plaintiff made two complaints about the conduct of other employees but denies that the plaintiff informed any of its employees or managers of (a) the nature of the alleged statements or (b) the plaintiff's contention that he was being subjected to harassment or a hostile work environment based on his sexual orientation until after June 2002, after the plaintiff had left work on short term disability.

25.    Hallsmith-Sysco admits that the plaintiff reported to Ms. Julia Gannon in July 2001 that he was being harassed by another employee. Hallsmith-Sysco denies that the plaintiff indicated the nature of this harassment or that it was related to his sexual orientation. Hallsmith-Sysco admits that Ms. Gannon indicated in that conversation Sysco had posted anti-harassment

posters in the facilities and that she would address the issue with the plaintiff's supervisor. The plaintiff indicated that he wished to address the issue with the employee who was allegedly harassing him. Ms. Gannon indicated that the plaintiff should report back to her if the harassment continued. Otherwise, Hallsmith-Sysco denies the remaining allegations in this paragraph.

26.     Hallsmith-Sysco denies the allegations in this paragraph stating that anti-harassment posters were posted at the Company prior to and after the plaintiff's July 2001 conversation with Ms. Gannon. Answering further, states that the plaintiff did not report any further incidents of harassment to Hallsmith-Sysco until he had been out on leave in 2002.

27.     Hallsmith-Sysco denies the allegations in this paragraph.

28.     Hallsmith-Sysco denies that the alleged conversation took place at the time identified in this paragraph. Hallsmith-Sysco admits that a conversation of this nature occurred in September 2002.

29.     Hallsmith-Sysco admits that after being given a warning by Jim Stone that he was taking excessive leave, the plaintiff made certain allegations of other employees "bothering" him. Hallsmith-Sysco denies the remaining allegations in this paragraph.

30.     Hallsmith-Sysco denies the allegations in this paragraph.

31.     Hallsmith-Sysco admits the plaintiff's last day of work for Hallsmith-Sysco was June 13, 2002 but denies the remaining allegations.

32.     Hallsmith-Sysco denies the allegations in this paragraph.

33.     Hallsmith-Sysco denies the existence of a hostile environment. Answering further, Hallsmith-Sysco is without information sufficient to independently admit or deny the remaining allegations in this paragraph.

34.    Hallsmith-Sysco denies the allegations in this paragraph.

35.    Hallsmith-Sysco is without sufficient knowledge to admit or deny the facts alleged in this paragraph.

36.    Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

37.    Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

**COUNT I**
**(M.G.L. c. 151b, §4 Hostile work Environment/Sexual Harassment)**

38.    Hallsmith-Sysco repeats its responses to the foregoing paragraphs and incorporates them as though fully set forth herein.

39.    Hallsmith-Sysco admits the allegations in this paragraph.

40.    Hallsmith-Sysco denies the allegations in this paragraph.

41.    Hallsmith-Sysco denies the allegations in this paragraph.

42.    Hallsmith-Sysco denies the allegations in this paragraph.

43.    Hallsmith-Sysco denies the allegations in this paragraph.

44.    Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

45.    Hallsmith-Sysco denies the allegations in this paragraph.

46.    Hallsmith-Sysco denies the allegations in this paragraph.

47.    Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

48.    Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

## COUNT II
## Reckless/Intentional Infliction of Emotional Distress

49.     Hallsmith-Sysco repeats its responses to the foregoing paragraphs and incorporates them as though fully set forth herein.

50.     Hallsmith-Sysco denies that it terminated the plaintiff and otherwise denies the remaining allegations in this paragraph.

51.     Hallsmith-Sysco denies the allegations in this paragraph.

52.     Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

53.     Hallsmith-Sysco denies that the alleged conduct occurred and otherwise denies the remaining allegations in this paragraph.

Hallsmith-Sysco denies that the plaintiff is entitled to the relief requested.

### FIRST AFFIRMATIVE DEFENSE

The plaintiff has failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Some or all of the plaintiff's claims are barred by the applicable statutes of limitation.

### THIRD AFFIRMATIVE DEFENSE

The plaintiff has failed to exhaust all necessary administrative remedies and/or satisfy all conditions precedent to filing suit.

### FOURTH AFFIRMATIVE DEFENSE

The plaintiff's claims are barred by the exclusivity provisions of Massachusetts' Workers' Compensation Act.

## FIFTH AFFIRMATIVE DEFENSE

The plaintiff failed to reasonably utilize existing anti-harassment remedies provided by Hallsmith-Sysco.

## SIXTH AFFIRMATIVE DEFENSE

Hallsmith-Sysco exercised reasonable care to prevent and correct promptly any sexually harassing behavior in its workplace.

## SEVENTH AFFIRMATIVE DEFENSE

Some or all of the plaintiff's alleged damages were caused by the conduct of third parties of which Hallsmith-Sysco had neither actual nor constructive knowledge.

## NINTH AFFIRMATIVE DEFENSE

The plaintiff is precluded from recovery in whole or in part due to his failure to act reasonably to mitigate his alleged damages.

## TENTH AFFIRMATIVE DEFENSE

The plaintiff's claims are barred by the doctrine of laches.

## ELEVENTH AFFIRMATIVE DEFENSE

The plaintiff's claims are barred by the doctrine of estoppel.

## JURY DEMAND

Hallsmith-Sysco demands a jury trial on all counts of the plaintiff's Complaint.

WHEREFORE, the defendant Hallsmith-Sysco Food Services, Inc., requests that this

complaint be dismissed with prejudice and it be awarded its costs of defense in this matter.

HALLSMITH-SYSCO FOOD SERVICES,
INC.

By its attorneys,

A True Copy By Photostatic Process
Attest:

_Asst. Clerk of Courts_

Richard C. Van Nostrand, Esq.
BBO #507900
Michael D. Badger, Esq.
BBO #633915
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: March 9, 2005

## CERTIFICATE OF SERVICE

I, Michael D. Badger, hereby certify that I have this day served a copy of the foregoing
document, by mailing a copy, first class mail, postage prepaid, to Joseph B. Lichtblau, Esq., Law
Office of Joseph B. Lichtblau, 92 State Street, Boston, MA 02109.

Michael D. Badger, Esq.

Dated: March 9, 2005



# MIRICK O'CONNELL
### ATTORNEYS AT LAW
MIRICK, O'CONNELL, DeMALLIE & LOUGEE, LLP

mdbadger@modl.com
Direct Line (508) 860-1536

March 9, 2005

***By hand delivery***

Clerk of Court – Civil
Bristol Superior Court
9 Court Street, Room 13
Taunton, MA 02780

      Re: Michael G. Campbell v. Hallsmith-Sysco Food Services, Inc.
          Bristol Superior Court, Civil Action No. BRCV2004-1300C

Dear Sir/Madam:

      Enclosed for immediate filing please find the defendant's Answer to Complaint (with jury demand).

      Thank you for your assistance in this matter.

                Very truly yours,

                Michael D. Badger

MDB/
Enclosure

cc:    Richard C. Van Nostrand, Esq.
        Julia Gannon
        Joseph Lichtblau, Esq.



WESTBOROUGH, MA
508-898-1501 • FAX 508-898-1502

{H:\PA\Lit\03390\02066\A0776576.DOC}

100 FRONT STREET
WORCESTER, MA 01608-1477
508-791-8500 • FAX 508-791-8502

www.MirickOConnell.com

BOSTON, MA
617-261-2417 • FAX 617-261-2418

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

FILED

MAR 2 8 2005

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. BRCV2004-
01300-C

MICHAEL G. CAMPBELL,
    Plaintiff

V.

HALLSMITH-SYSCO FOOD SERVICES,
INC.,
    Defendant

NOTICE OF FILING FOR REMOVAL

To:    Clerk of Court – Civil
        Bristol Superior Court
        441 N. Main Street, Room 1
        Fall River, MA 02720

        Pursuant to 28 U.S.C. §1446(d), the defendant, Hallsmith-Sysco Food Services, gives

notice that on March 18, 2005 it filed with the United States District Court for the District of

Massachusetts a Notice of Removal of this case from the Bristol Superior Court to the United

States District Court for the District of Massachusetts. Pursuant to 28 U.S.C. §1446(d), the filing

of the Notice of Removal effects the removal and this Court shall proceed no further unless and

until the case is remanded. A copy of the Notice of Removal is attached hereto.

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

{H:\PA\Lit\03390\02066\A0774722.DOC}

HALLSMITH-SYSCO FOOD SERVICES, INC.

By its attorneys,

Richard C. Van Nostrand, Esq.
BBO #507900
Michael D. Badger, Esq.
BBO #633915
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: March 25, 2005

## CERTIFICATE OF SERVICE

I, Michael D. Badger, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Joseph B. Lichtblau, Esq., Law Office of Joseph B. Lichtblau, 92 State Street, Boston, MA 02109.

Michael D. Badger, Esq.

Dated: March 25, 2005

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

## 05  10522 WGY

FILED
Clerk's Office
USDA Mass.
Date 3/17/05
By _____
Deputy Clerk

MICHAEL G. CAMPBELL,
    Plaintiff

    V.

HALLSMITH-SYSCO FOOD SERVICES,
INC.,
    Defendant

CIVIL ACTION NO. _____

I hereby certify on 3/18/05 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on _____
☒ original filed in my office on 3/17/05
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts

**NOTICE OF REMOVAL**   By: _____
Deputy Clerk

Pursuant to 28 U.S.C. §§1332, 1441 and 1446, the defendant, Hallsmith-Sysco Food

Services ("Hallsmith-Sysco"), removes this action to the United States District Court for the

District of Massachusetts.  The grounds for removal are as follows:

    1.    On or about November 22, 2004, the plaintiff, Michael Campbell, filed this

employment discrimination action in the Bristol Superior Court, Civil Action No. 04-01300.

    2.    On or about February 20, 2005, Mr. Campbell served upon counsel for Hallsmith-

Sysco a Summons and Complaint.  (A true copy of the Summons and Complaint served are

attached as Exhibit A).

    3.    Accordingly, this notice of removal is being filed within the time period required

by law, 28 U.S.C. §1446(b).

    4.    The plaintiff, Mr. Campbell, is a resident of Rhode Island. (Complaint ¶2).  The

named defendant, Hallsmith-Sysco, is a limited liability company organized under the laws of

Massachusetts with a principal place of business in the Commonwealth at 380 South Worcester

Street, Norton, Massachusetts.

{H:\PA\Lit\03390\02066\A0774726.DOC}

5.    In his Complaint, the plaintiff seeks recovery for alleged sexual harassment and
hostile work environment. He has demanded judgment for (quote his types of damages from
Complaint and Cover Sheet). He has filed a Civil Action Cover Sheet with the Bristol Superior
Court in which he asserts that his damages are "in excess of $25,000" and if successful may
recover attorneys' fees. See Exhibit A. While Hallsmith-Sysco denies any liability for the
claims asserted by the plaintiff, the amount of the matter in controversy may exceed $75,000.00.

6.    Because the amount in controversy in this case may exceed the sum or value of
$75,000.00 and is between citizens of different states, as set forth in 28 U.S.C. §1332, this case is
subject to removal under 28 U.S.C. §1441(a).

HALLSMITH-SYSCO FOOD SERVICES,
INC.

By its attorneys,

Richard C. Van Nostrand, Esq.
BBO #507900
Michael D. Badger, Esq.
BBO #633915
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: March 14, 2005

## CERTIFICATE OF SERVICE

I, Michael D. Badger, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Joseph B. Lichtblau, Esq., Law Office of Joseph B. Lichtblau, 92 State Street, Boston, MA 02109.

Michael D. Badger, Esq.

Dated: March 14, 2005

Form #42

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT DEPT. OF THE TRIAL COURT
CIVIL ACTION
No. BRCV2004 - 1300

[SEAL]

_Michael G. Campbell_ , Plaintiff (s)

v.

_Hallsmith - Sysco Food Services,_ Defendant(s)
_Inc._

(TO PLAINTIFF'S ATTORNEY :
    PLEASE INDICATE TYPE OF ACTION INVOLVED :—
    TORT — MOTOR VEHICLE TORT — CONTRACT —
    EQUITABLE RELIEF — OTHER.)

## SUMMONS

TO THE ABOVE-NAMED DEFENDANT:

    You are hereby summoned and required to serve upon _Joseph B. Lichtblau_

plaintiff's attorney, whose address is _92 State St., Boston, MA 02109_

an answer to the complaint which is herewith served upon you, within (20) days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.
You are also required to file your answer to the complaint in the office of the Clerk of this
Court at _Bristol Superior_ either before service upon plaintiff's attorney or within a
reasonable time thereafter.

    Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim
any claim which you may have against the plaintiff which arises out of the transaction or
occurrence that is the subject matter of the plaintiff's claim or you will thereafter be
barred from making such claim in any other action.

    Witness, Hon. Barbara J. Rouse, Adm. Justice of the Superior Court Dept. of the Trial
Court, at Taunton, the _17 th_ day of _February_, in the year
of our Lord two thousand and _2005_

_Mary J. Sawler, Esq._

(_Magistrate_

NOTICE TO DEFENDANT — You need not appear personally in Court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.

1.   This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2.   When more than one defendant is involved, the names of all defendants should appear in the caption. If
     a separate summons is used for each defendant, each should be addressed to the particular defendant.
3.   If the Commonwealth or an officer of agency thereof is a defendant, the time to be inserted is 60 days.

2SC 24

# Commonwealth of Massachusetts
## County of Bristol
## The Superior Court

CIVIL DOCKET# BRCV2004-01300-C

RE:    **Campbell v Hallsmith-Sysco Food Services, Inc.**

TO:    Joseph B Lichtblau, Esquire
       92 State Streeet
       Boston, MA 02109

### TRACKING ORDER - F TRACK

You are hereby notified that this case is on the **fast (F) track** as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | DEADLINE |
|---|---|
| Service of process made and return filed with the Court | 02/20/2005 |
| Response to the complaint filed (also see MRCP 12) | 04/21/2005 |
| All motions under MRCP 12, 19, and 20 filed | 04/21/2005 |
| All motions under MRCP 15 filed | 04/21/2005 |
| All discovery requests and depositions completed | 09/18/2005 |
| All motions under MRCP 56 served and heard | 10/18/2005 |
| Final pre-trial conference held and firm trial date set | 11/17/2005 |
| Case disposed | 01/16/2006 |

The final pre-trial deadline is **not the scheduled date of the conference**. You will be notified of that date at a later time.
**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**
This case is assigned to session C sitting in CtRm - Main (Taunton) at Bristol Superior Court.

Dated: 11/22/2004

Marc J. Santos
Clerk of the Courts

BY: Valerie A. Brodeur / Joseph T. Vincent, Jr.
Assistant Clerk

Location: CtRm - Main (Taunton)
Telephone: (508) 823-6588

Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130

Check website as to status of case: http://ma-trialcourts.org/tcic

cvdtract_2.wpd 425718 inidoc01 aguiarka

| CIVIL ACTION COVER SHEET | | Trial Court of Massachusetts Superior Court Department County: BRISTOL |
|---|---|---|

PLAINTIFF(S) Michael G. Campbell

DEFENDANT(S) Hallsmith Sysco Food Services, Inc.

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
Joseph B. Lichtblau, 92 State Street,
Boston, MA 02109 (617) 722-9955

Board of Bar Overseers number: BBO # 555020

ATTORNEY (if known) Richard C. Van Nostrand
(508) 791-8500  Mirick O'Connell
100 Front Street
Worcester, MA 01608-1477

## Origin code and track designation

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B22 | Employment Discrim | (F) | (X) Yes ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ........................................... $ To be documented
2. Total Doctor expenses ............................................ $
3. Total chiropractic expenses ...................................... $
4. Total physical therapy expenses ................................. $
5. Total other expenses (describe) ................................. $
   Subtotal $

B. Documented lost wages and compensation to date ................. $ To be documented
C. Documented property damages to date ............................. $
D. Reasonably anticipated future medical and hospital expenses ..... $
E. Reasonably anticipated lost wages ............................... $
F. Other documented items of damages (describe)
   $

G. Brief description of plaintiff's injury, including nature and extent of injury (describe) Lost Wages, Medical Expenses and severe emotional distress as set forth in the Complaint, causing damage in excess of $25,000.
   $
   TOTAL $

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT
N/A

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____ Joseph B. Lichtblau _____ DATE: 11/14/04

AOTC-6 mtc005-11/99

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss                                        BRISTOL SUPERIOR COURT
                                                   C.A. No. _____

---

MICHAEL G. CAMPBELL,

     Plaintiff,

v.

HALLSMITH-SYSCO FOOD
SERVICES, INC.

     Defendant.

---

## COMPLAINT AND JURY DEMAND

    1.   The Defendant, Hallsmith-Sysco Food Services, Inc. ("Hallsmith-Sysco") is a Delaware corporation, with a principal place of business in Massachusetts on 380 Worcester Street, Norton, Massachusetts (Bristol County).

    2.   The plaintiff is a resident of Warwick, Rhode Island.

    3.   Plaintiff was hired by Defendant on September 11, 2000, as a third shift dry warehouse worker at Sysco's warehouse, on 380 Worcester Street, Norton, Massachusetts.  As a third shift worker, Plaintiff worked overnight, from 7:00 P.M. to 5:00 A.M.

    4.   Plaintiff is a gay man.  Co-workers at Hallsmith-Sysco either knew that Plaintiff was gay or decided Plaintiff was gay based on his appearance, manner and other factors.

    5.   Plaintiff began working for Hallsmith-Sysco on first shift (a day shift), for training purposes, then was assigned to

the third shift after about two-and-a half months.  Another
worker, Al Jacobs ("Jacobs"), trained with Plaintiff on the day
shift then was also assigned to work on the third shift.  Jacobs'
third shift assignment was in the freezer department and
Plaintiff's was in the dry goods department, placing Jacobs and
Plaintiff in frequent contact at work.

6.    From approximately the second week Plaintiff began
working at Hallsmith-Sysco, while he and Jacobs were still in
training on the first shift, Jacobs made derogatory comments,
which were  directed at Plaintiff or intentionally made in
Plaintiff's presence, about Plaintiff being gay or about gays in
general.  Jacobs made these comments almost constantly, on nearly
a daily basis, through June 13, 2002, the day Plaintiff left
Hallsmith-Sysco.

7.    For example, Jacobs would say "Hey faggot, you're going
to die," or "You fucking fag, I'm going to kill you," and similar
statements to that effect.

8.    On one occasion, Jacobs asked if Plaintiff "liked being
fucked" by his "many boyfriends."  On another occasion, in or
around January 2001, Jacobs asked Plaintiff if Plaintiff had
"made rate" yet, and when Plaintiff replied no, Jacobs said it
was because "a queer" could not do this type of work.

9.    Jacobs frequently made these and similar derogatory
comments when one or more persons, often friends of Jacobs', were

-2-

present.  As a result, Plaintiff was subject to ridicule and humiliation and derision.

10.  On more than one occasion, Jacobs made derogatory comments about Plaintiff being gay or about gays in general in the presence of or within earshot of Ken Marnard, a supervisor.

11.  Jacobs often made these derogatory comments to Plaintiff while standing in intimidating positions, such as standing a few inches from Plaintiff with his index finger near Plaintiff's nose.

12.  There were also several occasions on which Jacobs made similar derogatory comments in Sysco's cafeteria, in a loud voice, so that any person, including management and executive personnel, could hear them.  For example, on one occasion, while Jacobs and Plaintiff were still on the day shift and Plaintiff was eating lunch in the company cafeteria, Jacobs said in a loud voice "Mike, you have AIDS, right, all faggots have AIDS."  On another occasion, Jacobs said (or yelled) in the cafeteria to another worker named Kevin Padgro, "Watch out Kevin, Campbell is going to try to grab your ass and dick."

13.  Around March 2001, other third shift workers began making derogatory comments to Plaintiff or in Plaintiff's presence about being gay or about gays in general, on a regular basis.

14.  Plaintiff's co-workers sometimes made these derogatory

-3-

comments about Plaintiff being gay or about gays in general in front of supervisors, including Ken Marnard and Art Coriea. On information and belief, Jim Stone, another supervisor, heard or was aware that workers made anti-gay comments on the third shift.

15.    For example, co-worker John Augustine told Plaintiff he would beat up Plaintiff if Plaintiff ever looked at him in a sexual way. On another occasion, in March 2002, John Augustine called Plaintiff "faggot" and "queer," then afterwards, while Augustine and Plaintiff were working in the same aisle, Augustine asked if Plaintiff needed a tampon "because Plaintiff was angry." From about January 2001 to June 13, 2002, John Augustine referred to Plaintiff constantly and on numerous occasions as "you fucking queer."

16.    Co-worker Trevor Ashley made many comments about gays in Plaintiff's presence, including "all gays should be dead." On another occasion, Trevor Ashley threatened to punch Plaintiff in the face, followed by "you fucking fag," or words to that effect.

17.    Co-worker Kevin Padgro, a friend of Jacobs, made numerous jokes about gays. On June 13, 2002, as Kevin Padgro, co-worker Kirby St. Amour and Plaintiff were leaving the building, Kevin Padgro asked Plaintiff in the presence of numerous other co-workers gathered near the exit, including three supervisors -- Ken Marnard, Jim Stone and Art Coriea -- if Plaintiff liked "chin music," explaining this referred to "when a

-4-

guy's balls slap your chin when you're giving head." Kevin Padgro then said to Plaintiff, "Hey Mike, do you like how it feels when you put Portuguese sausage up your ass?" The supervisors present clearly heard these comments, but did nothing, and in fact left the building. Other workers began following up on Kevin Padgro's comments and laughing at Plaintiff.

18. In or about June 2002, Art Coriea and about 5-7 workers Art Coriea supervises wore bandanas and yelled throughout the warehouse "We're the P-Town posse," while other workers imitated effeminate gay men and made jokes about gays.

19. A co-worker known as "Johnny Bravo" called Plaintiff a stupid fag on at least one occasion.

20. In July 2001, Ken Marnard (Supervisor) told Plaintiff that Plaintiff was not allowed to talk because Plaintiff was on light duty, even though there was no such rule. Subsequently, while Plaintiff was working at the supervisor's station as a desk clerk, Ken Marnard stood close to Plaintiff and passed gas. When Plaintiff tried to leave the desk because of the smell, Ken Marnard physically blocked Plaintiff's exit, then said to others who were watching, "Oh Cinderella can't handle the smell." Other workers laughed, while Jim Stone (a supervisor) sprayed a can of air freshener.

21. Co-worker Al Hebert on various occasions called

-5-

Plaintiff "stupid fag" or names to that effect.  Once, Al Hebert asked if Plaintiff was a "nigger lover" because Plaintiff listens to Jazz music.

22.  In or about February 2001, a co-worker known as "Reggie" from the dry department asked if Plaintiff had to be "so close" to him, while Plaintiff was working with "Reggie."  When Plaintiff apologized for being in the way, "Reggie" replied that he "didn't like fags around."  After this occurred, "Reggie" frequently blocked Plaintiff from getting into aisles or prevented Plaintiff from passing him, which affected Plaintiff's "pick" (number of items  picked off shelves) and consequently Plaintiff's bonus and incentive pay.

23.  Other co-workers referred to Plaintiff in his presence as "fag" or made derogatory comments about gays, such as for example, "faggots should be dead," or followed up on Al Jacobs' derogatory comments about gays or Plaintiff being gay when Jacobs made such comments.

24.  Plaintiff made Hallsmith-Sysco aware of the hostile environment Plaintiff encountered on several occasions, as well as the types of comments directed at Plaintiff or made in Plaintiff's presence.

25.  On or about July 5, 2001, Plaintiff informed Julia Gannon, Vice President of Human Resources, that the abusive comments about Plaintiff's sexual orientation and derogatory

comments about gays in general had been ongoing since September 2000. Julia Gannon promised to speak to Plaintiff's supervisors and promised to put up posters concerning discrimination. Julia Gannon also stated that Plaintiff "could not expect Sysco to change."

26. No such posters concerning discrimination were thereafter posted in the warehouse area, and the derogatory comments directed at Plaintiff concerning has sexual orientation continued after July 5, 2001.

27. On or about May 2, 2002, during Plaintiff's vacation, Plaintiff again spoke to Julia Gannon and told Gannon that Plaintiff could not take any more. Plaintiff informed Gannon that he was passing out, throwing up, had uncontrollable shaking and could not sleep.

28. On this occasion, Plaintiff gave Julia Gannon a list of names of persons who had made the aforementioned derogatory comments or engaged in the aforementioned conduct, including persons identified in this Complaint, and requested that Gannon speak with the individuals involved.

29. Subsequently, Plaintiff's treatment at Hallsmith-Sysco worsened. On or about June 4, 2002, Plaintiff spoke with Plaintiff's supervisor, Jim Stone, who told Plaintiff that he knew Hallsmith-Sysco was full of bigots but "never thought it bothered anyone." Jim Stone also admitted he had heard jokes

-7-

about gays.   Plaintiff informed Jim Stone that Plaintiff had
spoken with Julia Gannon.

30.   Jim Stone was present on June 13, 2002, when Plaintiff
was derided and humiliated of as Plaintiff was leaving the
building.  On other occasions, supervisors were present or within
clear earshot when comments were made ridiculing gays.

31.   Plaintiff did not return to Hallsmith-Sysco after June
13, 2002, following the incidents related herein which occurred
on that date.

32.   Plaintiff was constructively discharged from
Hallsmith-Sysco as of June 13, 2002.

33.   On June 14, 2002, Plaintiff's primary care physician
removed Plaintiff from Hallsmith-Sysco on the basis of a
temporary disability related to Plaintiff's knees.  Although
problems with Plaintiff's knees in fact created a temporary
disability, Plaintiff was also unable to return to work on
account of the continuous stress and symptoms caused by the
hostile environment at Hallsmith-Sysco.   Thereafter, Plaintiff
was temporarily, totally disabled from returning to work on
account of post-traumatic stress disorder.

34.   Throughout Plaintiff's employment at Hallsmith-Sysco,
Plaintiff experienced increasingly worsening symptoms, which
Plaintiff had not previously experienced, including blacking out,
throwing up, sleeplessness, uncontrollable shaking, racing

-8-

thoughts, severe headaches, severe anxiety and panic, and
depression.  On many occasions at Hallsmith-Sysco, Plaintiff felt
humiliated, ostracized, belittled, embarrassed and intimidated on
account of comments and conduct directed at Plaintiff because
Plaintiff is gay or was because Plaintiff was perceive to be gay.


35.    Plaintiff continued to experience many of these
symptoms subsequent to his last day of work at Hallsmith-Sysco.

36.    The continuous derogatory comments and conduct referred
to in this Complaint unreasonably interfered with Plaintiff's
work performance at Hallsmith-Sysco.

37.    Hallsmith-Sysco knew or should have known of the
aforementioned hostile environment, discrimination on account of
sexual orientation, and sexual harassment, and did not take
adequate measures to prevent these unlawful practices or
ameliorate the effect of these practices on Plaintiff.

COUNTS

COUNT I

(G.L. c. 151B, Sec.4/Hostile Environment/Sexual Harassment)

38.    Plaintiff repeats and reallges paragraphs 1 through 37
as if more fully stated herein.

39.    The defendant was plaintiff's employer.

40.    Plaintiff's co-workers and supervisors in the employ of
the defendant treated plaintiff differently from similarly

situated, heterosexual co-workers.

41.    Plaintiff's co-workers and supervisors in the employ of the defendant subjected Plaintiff to a hostile environment by making derogatory comments and engaging in conduct designed to humiliate Plaintiff on in the workplace on account of plaintiff's actual or perceived sexual orientation.  Said comments and conduct were pervasive and continuous and were perceived by Plaintiff as hostile.

42.    Plaintiff's supervisors and co-workers in the employ of the defendant made derogatory comments of a sexual nature to plaintiff, which comments had the purpose or effect of unreasonably interfering with plaintiff's work environment by creating an intimidating, hostile, humiliating or sexually offensive work environment, and additionally constituted sexual harassment under G.L. c. 151B, §1(18) and G.L. c. 151B, §4, ¶16A.

43.    The defendant knew or should have known that Plaintiff was subject to differential treatment, a hostile environment, and sexual harassment, all as aforementioned, and took no action, or ineffective action to prevent the plaintiff's continued exposure to said treatment, hostile environment or sexual harassment, and thereby allowed or permitted the plaintiff to be exposed to said differential treatment, hostile work environment and sexual harassment in the workplace in violation of G.L. c. 151B, §4.

44.    The plaintiff's exposure to differential treatment,

-10-

hostile work environment and sexual harassment continued after the defendant knew or should have known of the differential treatment, hostile work environment and sexual harassment.

45. Defendant constructively terminated plaintiff on the basis of his sexual orientation, in violation of G.L. c. 151B, §4(1) and (1B).

46. The defendant committed the practices complained of with knowledge or reason to know that said practices violated G.L. c. 151B, §4.

47. As a result of the aforementioned conduct of defendant, plaintiff suffered and continues to suffer harm, including lost wages and benefits, medical expenses, humiliation, mental anguish and embarrassment, emotional distress.

48. As a result of the aforementioned conduct of defendant, plaintiff suffered constructive termination from employment, and subsequent loss of wages.

## COUNT II

(Reckless/Intentional Infliction of Emotional Distress)

49. Plaintiff repeats and reallges paragraphs 1 through 48 as if more fully stated herein.

50. The defendant intentionally or recklessly terminated plaintiff based upon his actual or perceived sexual orientation.

51. The defendant recklessly or intentionally inflicted emotional distress or the defendant or knew or should have known

-11-

that emotional distress was likely to result from its conduct.

52.  The defendant's conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community.

53.  The defendant's conduct caused plaintiff severe emotional distress, mental anguish, humiliation and embarrassment of a nature that no reasonable person could be expected to endure.

<u>PRAYERS</u>

WHEREFORE, plaintiff prays this Court:

A.  Enter judgment for the plaintiff against the defendant;

B.  Award the plaintiff compensatory money damages against the defendant in an amount to be determined by this Court, including back pay, front pay, damages in lieu of benefits and other damages;

C.  Award the plaintiff punitive damages against the defendant for discrimination in all forms pursuant to G.L. c. 151B, Sec. 9;

D.  Award the plaintiff attorney's fees, costs and expenses of suit, as against the defendant, pursuant to G.L. c. 151B, Sec. 9;

E.  Enter such other relief as this Court determines is equitable and proper.

<u>JURY DEMAND</u>

PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE

-12-

MICHAEL G. CAMPBELL,

By his attorney,

Joseph B. Lichtblau
BBO # 555020
92 State Street
Boston, MA 02109
(617) 722-9955